IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ANDREW L. SOKOL,

        Defendant.

CASE NO. 1:09-CR-430-01-JEC

## DEFENDANT ANDREW SOKOL'S SENTENCING MEMORANDUM

Defendant Andrew Sokol, by and through undersigned Counsel, respectfully submits this Sentencing Memorandum to assist the Court in determining a reasonable sentence following his plea of guilty to Count One of the indictment in this case. As discussed more fully herein, defendant Sokol requests a downward variance from the advisory Guidelines sentence based upon the factors set forth in 18 U.S.C. § 3553. Specifically, defendant Sokol contends that the advisory Guidelines sentence here is significantly greater than necessary to comply with the purposes of sentencing and is, therefore, unreasonable. Defendant Sokol requests that the Court instead fashion an individualized sentence that gives full consideration to all of the Section 3553 factors and respectfully submits that a sentence of between 24 and 30 months imprisonment is a more appropriate sentence in this case.

## I.    PRELIMINARY STATEMENT

Having pleaded guilty and accepted responsibility for his actions, defendant Sokol stands before this Court to be sentenced.  The Court, following *United States v. Booker* and its progeny, must give due consideration to the factors set forth in 18 U.S.C. § 3553.  The statute mandates imposition of a sentence that is "sufficient, but not greater than necessary" to accomplish the basic goals of sentencing, namely just punishment (i.e., retribution), deterrence, protecting the public, and rehabilitation.  18 U.S.C. § 3553(a).  In the case of white collar crimes, the Guidelines are driven largely by the loss or intended loss amount, without consideration of the other § 3553(a) factors.  Accordingly, the sentence recommended by the Probation Office of at least 121 months in custody does not produce anything approaching a fair and just sentence in this case.  Indeed, even the United States concedes that the Probation Officer's guideline calculation and recommended sentence is much greater than appropriate.

In fashioning a "sufficient, but not greater than necessary" sentence here, defendant Sokol respectfully urges the Court to consider not only the totality of his life and character – as described by his family and friends who know him best and have written on his behalf – but also the following mitigating facts that bear strongly on determining a just punishment in this case:

- First, defendant Sokol has pleaded guilty and accepted full responsibility for his actions.

- Second, defendant Sokol is a first time offender.  Defendant Sokol learned of the government's investigation in September 2007.  In nearly four years since that time, defendant Sokol has committed no subsequent offenses, fully complied with the conditions of his pretrial release, and maintained fulltime employment.

- Third, the loss amount set forth in the PSR is incorrect and even the lesser amount agreed to by the United States greatly overstates defendant Sokol's criminal liability.

- Fourth, defendant Sokol was a partner in the illegal activity with John Radin, a fellow chiropractor who was permitted to plead guilty to misprision of a felony and received a sentence of just 6 months home confinement.  While defendant Sokol does not suggest that he should receive that same sentence, he contends that a sentence which includes incarceration for 4 or 5 times greater than rather than Dr. Radin's sentence of home confinement adequately satisfies the goals of punishment (i.e., retribution), deterrence, protecting the public and rehabilitation.  On the other hand, a sentence that is 10 or 20 times

greater (as requested by the United States and the Probation Office) violates the rule against unwarranted sentencing disparities.

## II.    PERSONAL BACKGROUND AND SUMMARY OF THE OFFENSE

Defendant Sokol is 43 and has no prior criminal history.  He was born in Long Branch, New Jersey to a father who worked as a court reporter and a mother who worked as a teacher.  He has two sisters and he has always been a big part of their lives.  As set forth in the letter from his sister, Wendy, Defendant Sokol enjoyed judo and karate as a child and even earned his black belt. (Wendy Sokol's letter to the Court and several other letters from family and friends are attached hereto at Tab A.)  He was a member of the boy scouts and his high school wrestling team.

After high school, defendant Sokol attended and graduated from the School of Visual Arts in New York and then moved to Atlanta to attend Life University. While in school he opened a bookstore near campus and sold textbooks to fellow students.  Upon graduation, he opened his own practice called ChiroFirst and began treating patients.  Defendant Sokol soon became aware of a national licensing organization known as WellnessOne which advises chiropractors about how to build their practices, increase patient care, and run a successful clinic.

Defendant Sokol became the licensed WellnessOne affiliate in Georgia when he converted his clinic from ChiroFirst into WellnessOne of Duluth.

Defendant Sokol has always been a kind and giving person.  A family friend, Vikki Baskette-Fassnacht has written a letter explaining that, when her daughter was in a bad car accident and needed medical care, defendant Sokol treated her. He knew that neither Ms. Baskette-Fassnacht nor her daughter could afford to pay for the treatments that he provided and never sent them bill.  Nonetheless, he continued treating her for months.  Defendant Sokol also cares deeply for animals – particularly those without a home.  Several of his family and friends have explained that he gives time and money to organizations that care for stray animals.  He has also adopted three cats and three dogs from various rescue organizations.  It may seem petty to some, but these acts of kindness evidence defendant Sokol's true character and kind heart.

His sister Wendy writes that their mother passed away several years ago. Defendant Sokol became the "rock" of the family – helping his father and sisters get through the difficult time.  Defendant Sokol remains close with his father who suffered several heart attacks earlier this year.  In a letter, his father explains that his son is his sole source of financial support.

While in school at Life University, defendant Sokol met Julie Weisberg, and the two began dating.  Dr. Weisberg was working in Marietta, Georgia for a chiropractor named John Radin.  In late 2004, defendant Sokol asked Weisberg and Radin to join his WellnessOne practice and they agreed.  Defendant Sokol provided funds to renovate and expand Radin's clinic and, as a result, acquired a one-third ownership interest in what became WellnessOne of Marietta.  Radin and Weisberg each became one-third owners of the company.  Defendant Sokol and Julie Weisberg married in June 2005.  Over the next several years, defendant Sokol opened up eight other WellnessOne Clinics in the metro-Atlanta area under the WellnessOne of Georgia umbrella.  WellnessOne of Marietta, however, was always the largest and most successful clinic – accounting for approximately 58% of WellnessOne of Georgia's total revenue.

Defendant Sokol has admitted to fraudulently submitting reimbursement claims to private insurance companies and accepts responsibility for his actions. Most of this illegal activity involved billing for medical massages that were provided to WellnessOne patients.  He did not, however, open his practice or expand WellnessOne with the purpose of committing this fraud.  Based upon information that he read on the Internet and/or obtained at various conferences, he believed that his clinics could provide medical massages to patients and bill

insurance companies for those services.  That was not a far-fetched idea – a walk through Colony Square Mall, a drive by chiropractic clinics throughout Atlanta, or a simple Internet search will lead one to believe that such treatment is lawful.

Dr. Sokol researched this issue and believed that such treatment was permitted under certain circumstances – particularly when a physical therapist or medical doctor writes a prescription for massage and when the massage is provided by the therapist or someone working under his supervision.  Defendant Sokol intended to operate within these bounds.   As he began this practice, he continued to do research on the Internet, speak with other chiropractors about their practices, and even sought advice from an attorney about how to bill for medical massage.  In September 2006, he asked an attorney to "evaluate (1) the definition of a therapist under the new CPT codes and (2) the relevant rules applicable to massage therapists under the new massage therapist codes."  Defendant Sokol sought this advice for the purpose of confirming his belief that licensed massage therapists qualified as "therapists" under the CPT codes and that they could bill for medical massage under the name of a licensed physical therapist or doctor.  Defendant Sokol obtained a written opinion from that attorney and believed that the opinion supported this practice.  Specifically, the letter reiterated that defendant Sokol was

"seeking clarification on the CPT code definition of therapist."   The attorney advised as follows:

> so long as the state licensing statutes for each professional are complied with, the professionals act within the lawful scope of their profession, and the services are ones covered by a particular insurance plan, then *a variety of professionals, including massage therapists, should be able to act incident to treatment under the direction of a duly licensed physician and have said services covered by insurance.* However, certain billing codes are limited to practitioners of a particular profession (a physical therapist report obviously must be performed by a physical therapist and such a duty would be non-delegable).   In addition, each particular plan may further refine the CPT codes and limit the professionals who can work under a particular billing code, as is the case with Medicare, and it is therefore imperative that each insurance plan be scrutinized as to its particular definitions as they relate to coverage.
>
> Massage therapists in Georgia are now required to be licensed. . . . Prior to July 1, 2007, the requirements for obtaining this license are relaxed, and generally only require approved certifications or work experience as well as good moral character.  After July 1, 2007, a more extensive process which includes testing will be required for licensing.

(A complete copy of this letter is attached at Tab B.)    Again, as a result of his research, discussions with others, and advice of counsel, Dr. Sokol believed that he could bill insurance companies for massages performed by massage therapists *so long as* a physical therapist or medical doctor wrote a prescription for that massage and *so long as* the massage therapist worked under the direction and supervision of the physical therapist or doctor.

Unfortunately, defendant Sokol's business grew so fast that he was not able to insure that patients saw physical therapists or doctors in order to obtain a prescription for massage. Moreover, the physical therapists and doctors were not able to supervise directly the treatment by massage therapists. Defendant Sokol became aware that this was occurring and did not stop the billing process but rather allowed it to continue. He regrets this greatly, and it was this lapse of judgment that led to his indictment.

The government executed a search warrant at WellnessOne's main office in September 2007. Thereafter, most insurance companies refused to pay his claims and defendant Sokol spent nearly all of the money he had previously received from insurance companies paying employees' salaries and trying to operate his business. Defendant Sokol eventually closed his business entirely. He was indicted by the United States on October 6, 2009 and entered his plea on October 21, 2010.

## III.   DETERMINING THE APPROPRIATE SENTENCE

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, and sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 128 S. Ct. 586, 598 (2007). Since the Sentencing Guidelines became advisory in

*Booker*, the "range of choice dictated by the facts of the case [has been] significantly broadened." *Id*. at 602. Moreover, the Supreme Court has specifically rejected a rule that would require "extraordinary circumstances" to justify a sentence outside the Sentencing Guidelines range. *Id*. at 595.

After *Booker* and *Gall*, a district court begins all sentencing proceedings by correctly calculating the applicable Guidelines range. While the Guidelines are a "starting point" and an "initial benchmark," they are not the only consideration, and a sentencing court may not presume that the Guidelines sentence is reasonable. *Id*. at 596-97. After giving both sides the opportunity to argue for whatever sentence they believe to be appropriate, the sentencing court should then consider all of the Section 3553(a) factors to determine whether they support the requested sentence, making "an individualized assessment based on the facts presented." *Id*. at 597.

When the sentencing court determines that a sentence outside the Guidelines is warranted, it then must consider the extent of the deviation and ensure that the justification is sufficient to support the variance. *Id*. Finally, once the appropriate sentence is chosen, the sentencing court must adequately explain it. *Id*.

A.      **The Advisory Guidelines Calculation**

As noted above, the Court is directed to begin the sentencing proceeding by correctly calculating the applicable Guidelines range, including any applicable downward departures.  *Gall*, 128 S. Ct. at 596 (citing *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007) ("sentencing judges, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines," and may then determine that the Guidelines sentence should not apply because, for example, it "fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless")).  Defendant Sokol, therefore, will begin by addressing the Guidelines and a disagreement with the U.S. Probation Officer over the applicability of several enhancements.

It should be noted at the outset that, in his initial objection to the PSR, defendant Sokol raised several objections, including objections to the loss calculation and the mass marketing enhancements.  The revised PSR included additional facts to support the mass marketing enhancement – specifically defendant Sokol's use of billboard and mail inserts to solicit new patients.  As a result of these additional facts and as a result of counsel's negotiations with the United States, defendant Sokol hereby withdraws his objection to this enhancement.  Likewise, counsel has spoken to the United States and understands

that the government now agrees with defendant Sokol's objection to the loss calculation, specifically that the appropriate loss figure is $6,599,456.99 rather than the $15 million loss figure included in the PSR.

### 1.    The Base Offense Level Should Be Six – Not Seven.

Defendant Sokol objects to the recommendation in Paragraph 75 that the base offense level is 7.  Sentencing Guidelines Section 2B1.1 provides a base offense level of 6, unless the offense of conviction provides a statutory maximum term of imprisonment of 20 years or more, in which case the base offense level is 7. Defendant Sokol pleaded guilty to Count One of the indictment, which alleged a conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1349.  That conspiracy charge included two objects: first, a violation of 18 U.S.C. § 1347, which includes a 10-year maximum sentence and would ***not*** justify the higher base offense level, and, second, a violation of 18 U.S.C. § 1341, which includes a 20-year maximum sentence that would justify the higher offense level.  At the time of the plea agreement, it was the intent of both the United States and defendant Sokol that defendant Sokol would enter a plea under the first object of the conspiracy (healthcare fraud), resulting in a base offense level of 6.  Indeed, the plea agreement specifically states that defendant Sokol faced a maximum term of 10 years incarceration.

Counsel for defendant Sokol has spoken to the responsible Assistant United States Attorney who agrees that the base offense level should be 6 for this reason.

### 2.     The Intended Loss Was Not $15 Million.

The presentence report recommends that defendant Sokol be held accountable under U.S.S.G. § 2B1.1(b)(1)(H) for intended losses of $15,074,122.18 – the total amount that he billed the insurance companies under five CPT codes. (PSR at ¶¶ 16, 71, 76). The result is a 20 level increase in his base offense level. Defendant Sokol contends that this amount greatly overstates the intended loss and that the appropriate loss – for Guideline purposes – is between $2,500,000 and $6,999,999 – leading to an enhancement of 18 levels. (As set forth below, defendant Sokol is prohibited from arguing – in calculating his Guideline Sentence – that the loss is less than this. But, by way of a variance, defendant Sokol contends that this figure greatly overstates the actual loss. That argument is set forth below.)

Since filing defendant Sokol's initial objections to the PSR, counsel has spoken to the Assistant United States Attorney responsible for this matter and has agreed to withdraw the defendant's objection to the mass marketing enhancement. Likewise, the United States has agreed that the loss calculation should be $6,599,456.99 – that is, the amount that defendant Sokol received from the

insurance companies.  By the time the United States and defendant Sokol reached this agreement, the revised PSR had been issued and continues to recommend a loss of $15 million.  For that reason, defendant Sokol includes his objection to the PSR in this Sentencing Memorandum.

Section 2B1.1 of the Sentencing Guidelines provides that the base offense level for a healthcare fraud conviction should be increased based upon the "*greater of the actual or intended loss*."   U.S.S.G. Section 2B1.1, App. Note 3.   The probation officer and the court, therefore, must determine the loss that defendant Sokol caused or intended to cause.

The illegal activity that the United States alleged against defendant Sokol and that defendant Sokol pleaded guilty to in this matter involved his billing of 5 CPT codes, specifically codes 97110, 97112, 97140, 97530 and 97012.   More specifically, the government alleged and defendant Sokol agreed during the plea colloquy that – at defendant Sokol's direction and with his knowledge – his clinics (1) billed massages under one or more of these codes and listed a physical therapist as the service provider when the massages were provided by massage therapists, (2) continued to provide chiropractic adjustments to patients after they had exhausted their chiropractic coverage and – rather than billing for the adjustment – billed for other services associated with the patients' chiropractic visits (such as the use of a

hydro bed, intersegment traction label, or wobble chair) using one of the five codes and submitting the claim under the name of a physical therapist who had not provided those services, and (3) billed personal training services under one or more of these codes even though a physical therapist did not provide those services.

In this case, the government has acknowledged that defendant Sokol actually received $6,599,456.99 for all of his billings of the five codes at issue. This is the amount of the "actual loss" and – if used for Guideline purposes – would result in an 18-level enhancement rather than a 20-level enhancement proposed by the PSR. The PSR, however, alleges that the "intended loss" was $15 million and bases this finding on the total amount that defendant Sokol *billed* for these five codes. The evidence, however, is undisputed that defendant Sokol did *not* intend or expect to receive the total amount that he billed. As a result, the billed amount cannot possibly be the "intended loss."

Private insurance companies like those at issue in this case have a schedule of "allowed amounts" for each CPT code. Regardless of the amount that the provider bills, the insurance company will only pay a certain percentage of its own "allowed amount." Defendant Sokol was aware of this payment methodology. Even though the insurance companies did not widely publish their allowed amounts to out-of-network providers like defendant Sokol, he knew that each company had an

"allowed amount" that it used to calculate the payment that it would make to WellnessOne. Defendant Sokol further knew that the companies paid only a percentage of that amount. Indeed, each patient's insurance card stated the percentage of the allowed amount that the company would pay for treatment of that patient. Defendant Sokol never intended to be paid the "billed amount." Rather, he expected to be paid a percentage of the allowed amount.

Defendant Sokol was further aware that if he billed an amount below an insurance company's allowed amount, the insurance company would pay only its fixed percentage of the billed amount. Defendant Sokol, therefore, included a "billed amount" that he believed to be in excess of the insurance companies' allowed amounts. His billed amount was purely a fictional number that was intended to assure that he received the full amount available. He never expected or intended to be paid his billed amount and knew that he would not receive that amount. He intended to receive the full percentage of the allowed amount that the companies would pay for each CPT code. Indeed, the United States has acknowledged that he had this understanding and, therefore, has agreed that the billed amount is not the appropriate loss determination but rather that the Court should use the amount paid in determining the advisory Guideline sentence.

The reimbursement methodology in this case is no different than the payment methodology under the Medicare Program.  Like the insurance companies, Medicare only pays a percentage of an "allowed amount" for each CPT code that is billed.  That amount is commonly referred to as the "Medicare allowed amount."  Healthcare providers know that when they bill a CPT code they will only receive a percentage of the Medicare allowed amount for that procedure.  Courts, therefore, have routinely rejected the "billed amount" as the measure of intended loss in the Medicare context and have embraced defendant Sokol's position that the amount paid more accurately represents the intended loss.  In *United States v. Fallah*, No. H-07-155, 2008 WL 5102281 (S. D. Tex. Dec. 1, 2008), for example, the defendants pleaded guilty to conspiracy to commit healthcare fraud by billing Medicare for medically unnecessary ambulance services.  At sentencing, the government – like the PSR in this case – argued that the amount the defendants ***billed*** Medicare should be the intended loss.  *Id*. at *1.  The court disagreed because the defendants "knew that Medicare would not pay the billed amount but would only reimburse a capped portion of that amount."  *Id*.  As a result, the court held that the proper measure of the intended loss was the amount that the defendants ***actually received*** from Medicare – "the intended and actual loss amounts are the same … the amount paid

- 17 -

to the defendants by Medicare for ambulance trips that did not have the required certificates of medical necessity." *Id*. at *2.

Similarly, in *United States v. Nachamie*, 121 F. Supp. 2d 285, 293 (S.D.N.Y. 2000), a group of doctors were convicted of defrauding Medicare in a manner similar to the conduct that defendant Sokol has acknowledged. Specifically, the doctors billed for different services than they actually performed, services rendered by unlicensed non-doctors or unsupervised non-doctors, and services rendered on a single day, rather than on various dates claimed. *Id*. at 289-90. Again, the government argued that the intended loss was "the full amount **billed** to Medicare." *Id*. at 290. The defendants argued that the billed amount was irrelevant as "no one intended Medicare to pay the amounts billed." *Id*. at 291-92. The court refused to use the billed amount and reasoned that the "intended loss must mean what it says" – that is, the loss based on defendants' subjective intent shaped by his or her understanding of the billing and payment program. *Id*. at 293. The court, therefore, agreed with the defendants and held that the amount paid by Medicare was the intended loss because "the defendants knew that Medicare always reimbursed procedures at a fixed or 'capped' rate per procedure. Thus, [their] intent was that Medicare reimburse them, at Medicare's capped rate, for the procedures reflected in the submitted bills." *Id*. *See also United States v. Ekpo*, 266 Fed. Appx. 830, 2008

WL 450485, at *3-4 (11th Cir. Feb. 21, 2008) (**actual amount** of claims paid by Medicare was appropriate loss amount for sentencing); *United States v. Nastasi*, No. 00 CR 809(S-1)(ILG), 2002 WL 1267995, at *4 (E.D.N.Y. Apr. 17, 2002) (entire **amount paid** by Medicare and Medicaid was appropriate amount of loss).

Like the defendants in *Fallah, Nachamie*, and the other cases, defendant Sokol knew that he would **not** be paid the amount that he billed the insurance companies.  Defendant Sokol, like the doctors in these cases, expected to be reimbursed at a percentage of the allowed amount which varied by insurance company and patient.  In accordance with precedent, the most accurate representation of defendant Sokol's intent and the correct measure of the intended loss – as agreed to by the government – is the amount defendant Sokol was paid for services that were fraudulently billed – that is, $6,599,456.99.

Defendant Sokol believes that even this amount overstates his actual criminal intent because it includes the total amount that he was paid for the five codes.  But, not every one of those billings was fraudulent.  Some – indeed many – of these five codes were billed by chiropractors for services that they provided outside the scope of illegal activity.  While defendant Sokol is not permitted by the plea agreement to attempt to quantify the amount he received for legitimate services, the paid amount certainly includes some legitimate payments.  This provides additional reason for the

Court to conclude that the intended loss for Guideline purposes cannot be more than $6,599,456.99.

**3.      There Should Be No Enhancement Under the "Financial Institution" Provision.**

Defendant Sokol objects to the recommendation in paragraph 78 that the court apply a two-level enhancement because this matter involved a "financial institution." The insurance companies at issue provided health insurance – they were not financial institutions.  While the comment to this enhancement includes a reference to insurance companies, the statutory provisions identified in the commentary are fraud provisions that apply to financial institutions such as banks and investment companies.  Defendant Sokol was charged with healthcare fraud – that is, fraud against a healthcare benefit program – not financial institutions fraud.  Perhaps the reference to insurance companies was included in the commentary because some insurance companies also provide banking, lending, and investment services.  But, that is not relevant to the facts at issue in this case.

More importantly, at the time of the plea, neither the United States nor defendant Sokol anticipated that this enhancement would apply.   Counsel for defendant Sokol has spoken to the responsible Assistant United States Attorney who agrees with this representation.   Accordingly, defendant Sokol asks that the Court not extend the financial institutions fraud to the facts of this case.

Counsel acknowledges that one court has applied this enhancement to a health insurance company. *See United States v. Lauersen*, 348 F.3d 329, 343 (2d Cir. 2003). Defendant Sokol believes that decision was wrong and should not be followed. But, to the extent the PSR includes this recommended enhancement, it should note that the court in *Lauersen* recognized that, when given along with a significant enhancement for the amount of loss, an enhancement under this section might warrant a downward departure. Specifically, the Court held that "the cumulative effect of [these] enhancements ha[d] a significant effect upon the applicable sentencing range." *Id*. at 344. The court reasoned that

> …the accumulation of such substantially overlapping enhancements, when imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance that is present 'to a degree' not adequately considered by the Commission…and therefore permits a sentencing judge to make a downward departure.

*Id*. As a result, to the extent this enhancement remains, the PSR should be revised to identify the combination of this enhancement and the significant loss enhancement as a basis for a downward departure or variance.

### 4.   The Court Should Apply a Two-Level Leadership Enhancement as Agreed By the Parties.

Defendant Sokol objects to the recommendation in paragraph 80 that the court impose a four-level adjustment for the defendant's role in the offense. As part of the

plea agreement, the United States agreed to recommend a two-level enhancement for role in the offense based upon its knowledge of the facts and circumstances surrounding the defendant's conduct. Defendant Sokol contends that the United States has a better understanding of those facts and has agreed to the appropriate enhancement for role in the offense. Indeed, the United States has filed an objection to the PSR's recommendation of a four-level enhancement.

**B.      Fashioning a Sentence No Greater Than Necessary**

As discussed above, 18 U.S.C. § 3553(a) provides that the court "shall impose a sentence sufficient, but not greater than necessary," to accomplish the sentencing goals enumerated in the statute's subsections. The court, in determining the particular sentence to be imposed, shall consider: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(1), (2), & (6). Here, defendant Sokol respectfully submits that an evaluation of all the section 3553(a) factors supports a

downward variance from the recommended guideline range and a sentence between 24 and 30 months incarceration.

### 1.    Nature and Circumstances of the Offense.

Just as the Court is to "consider every convicted person as an individual" so, too, must the Court evaluate "every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 128 S. Ct. at 598 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).  Defendant Sokol has admitted that he committed a serious crime and has accepted responsibility for his actions.  Nevertheless, without making excuses for his conduct or minimizing the significance of his actions, defendant Sokol respectfully contends that, even if the Court sustains defendant Sokol's objection to the PSR's loss calculation and determines that the loss is $6,599,456.99, this loss overstates the actual harm.   This amount represents the total payments that WellnessOne received for *all* payments of the five CPT codes at issue, specifically codes 97012, 97110, 97112, 97140, and 97530*.*  In other words, the government's damages claim assumes that *every time* WellnessOne billed one of these five codes during the relevant time period, that billing was fraudulent.

The United States required defendant Sokol to agree to this loss amount as part of his plea agreement and in order to receive acceptance of responsibility.  The

plea agreement specifically states that, while defendant Sokol may challenge the government's loss calculation on the basis that the intended loss was not the billed amount, defendant Sokol can raise no other objections to the loss calculation. *See Plea Agreement* at p.5. (A copy of defendant Sokol's Plea Agreement is attached at Tab C.) But, defendant Sokol has always asserted that not all five of these codes were fraudulent. As a result, the United States agreed that defendant Sokol could raise this issue as part of a request for a variance. The United States, however, further tied defendant Sokol's hands by requiring him to agree that in making this argument he would not seek to quantify the portion of these billings that were not fraudulent. Specifically, the government required defendant Sokol to agree that:

> in requesting a variance pursuant to Title 18 United States Code Section 3553(a), the defendant may assert that not all of the claims he submitted were fraudulent, but in making such an argument, the defendant will not attempt to quantify the number or amount of claims that he alleges were not fraudulent. By way of example, the defendant will not assign any percentage or dollar figure to any claims he alleges were not fraudulent.

*Id.* While a strange limitation on a Court's right to consider all relevant facts and circumstances in deciding an appropriate sentence, defendant Sokol accepted this limitation and intends to abide by the agreement.

Nonetheless, by way of a variance, the undisputed evidence shows that not all billings under the five codes were fraudulent. These codes were used not just to bill

for massages provided by therapists, adjustments when patients ran out of chiropractic coverage, or personal training – that is, the fraudulent activity at issue in this case. Rather, these codes were used time-and-time again by various chiropractors who treated patients and filled out treatment notes indicating their belief that the services they provided warranted billings under these codes.

These are standard physical therapy codes. Chiropractors are permitted to bill physical therapy codes provided that they obtain additional training in physiotherapy and pass a national board exam to become certified in physiotherapy. All of the WellnessOne chiropractors had this certification. As a result, there was nothing fundamentally illegal, improper, or fraudulent about chiropractors billing these codes.

The best examples of this appropriate billing occurred in 2005 at the Marietta clinic. In that year, most of the patients at the clinic had MBNA insurance which allowed unlimited chiropractic visits. When chiropractors saw patients, they filled out a "travel card" that explained the chiropractic and physical therapy services that they provided. Each individual chiropractor – not defendant Sokol – identified the codes that he or she believed should be billed. The individual clinics then billed those codes for the services rendered. This process was entirely appropriate.

A review of travel cards regarding individual patient's chiropractic visits and the BC/BS billing data provided by the United States confirms that these billings were not part of the illegal activity at issue in this case. For example, a patient identified as E.H. received chiropractic adjustments and related physical therapy from chiropractors at the Marietta clinic on 12 occasions in 2005. Each time, the chiropractor marked various codes on the patient's travel card that resulted in billings under one or more of the five "97 codes." The travel card and billing data for each of EH's visits to the Marietta clinic in 2005 is attached at Tab D. Counsel has included a column in the billing data provided by the government entitled "Chiropractor's note of treatment (explanation)" that includes the handwritten note by the chiropractor to identify the "97" CPT code to be billed. The notes for EH show as follows:

- On June 23, 2005, EH received her first adjustment and several physical therapy procedures. The chiropractor filled out the travel card with the code "iA" – which stands for iAdjust, a manual adjustment procedure that includes manual therapy. This resulted in a billing under CPT code 97140 (Manual Therapy).

- The chiropractor also wrote "TATE" – which stands for therapeutic activities and/or therapeutic exercises. By including this note, the chiropractor indicated his belief that one of the procedures he performed or had the patient perform amounted to some type of therapeutic activity or therapeutic exercise. As a result of his judgment and note, the clinic billed CPT code 97530 (Therapeutic Activities).

- As a result of some other procedure he performed, the chiropractor wrote "NMR" – which stands for neuromuscular re-education – indicating his belief that he had performed a procedure that satisfied a billing under CPT code 97112 (Neuromuscular Re-education).

As reflected in the billing information the United States provided, WellnessOne of Marietta billed codes 97140, 97530 and 97112 – the codes the chiropractor indicated – for the treatments that he provided to EH on June 23, 2005. As demonstrated at Tab D, on each of EH's subsequent visits in 2005, the treating chiropractor included the same handwritten notes indicating his or her belief that these CPT codes should be billed for the services rendered and the codes were billed.

EH is not a unique patient. It was standard practice at the Marietta clinic and the other clinics in 2005 for the treating chiropractor to complete a patient's travel card with these notes. Defendant Sokol has included additional examples at Tab E. For each example, defendant Sokol has included each patient's travel card and the corresponding billing data (with explanation) for the CPT codes chosen by the chiropractor on the dates of service and billed to BC/BS. In each instance, these codes were billed and paid because Dr. Radin and the other chiropractors indicated their belief that they had provided services that warranted these billings. Defendant Sokol did not make that judgment nor did any billing department alter

the chiropractors' decision as to the codes that should be billed. Nonetheless, the United States has included these billings in its "fraud calculation."

Defendant Sokol is prohibited from quantifying the billings that he claims were not part of the fraudulent activity and, therefore, he has not done so. This analysis, nonetheless, shows that the $6.5 million loss figure pushed by the government certainly overstates the extent of defendant Sokol's criminal activity.

## 2.     The Need to Avoid Unwarranted Sentence Disparities.

The need for uniformity in sentencing of similarly-situated defendants must be a priority of sentencing courts. This is because unwarranted disparity between sentences not only fails to serve the legislative intent reflected in 3553(a)(6), it also suggests an arbitrary level of decision making that fails to "promote respect for the law." *United States v. Laze*, 439 F.3d 928, 929 (8th Cir. 2006). As stated above, defendant Sokol's plea agreement prohibits him from attempting to quantify the amount of the $6.5 million in "loss" he contends is unwarranted. As a result, defendant Sokol believes that the Court should look to the sentence received by Dr. Radin as it provides a "government-sponsored" metric for judging the seriousness of the illegal activity at issue. In other words, Dr. Radin's sentence provides a point of comparison or a benchmark for a sentence that the United States accepted

from defendant Sokol's primary conspirator and that should have some relationship to the sentence imposed upon defendant Sokol.

Dr. Radin was a one-third owner in the Marietta clinic, the clinic that accounted for nearly 58% of the total reimbursements received by all of the clinics.[1]  Dr. Radin actively managed that clinic through the relevant time period. He was at the clinic every day and oversaw its billing practices.  He was fully aware of its operations and billings.  He was involved in many of the practices that the United States raised in the indictment against defendant Sokol.  Dr. Radin, for example, had begun waiving deductibles and co-payments – a practice that the United States included in the indictment – when he was operating his practice before joining WellnessOne.  He was also giving away gift cards – another practice that the United States criticized in the indictment – long before he joined defendant Sokol.  Defendant Sokol did not initiate these practices; he inherited them from Dr. Radin.

He and defendant Sokol also spoke about their use of massage therapists to provide medical massages for billing to the insurance companies.  Dr. Radin understood that the patients should have been required to obtain a prescription

---

[1] The billing data shows that the Marietta Clinic (provider identification numbers 311840917 001 and 205880224 001) accounted for $3,816,186.30 out of total payments of $6,599,456.99, or 57.8%.

from a physical therapist or medical doctor prior to receiving a massage and was also aware that this was not happening.  Indeed, he personally allowed this to happen with his own patients. While getting a chiropractic adjustment from Dr. Radin, an undercover agent working for the FBI asked how he could receive a massage.  Dr. Radin explained that the patient had to receive 8 adjustments before receiving a massage so the clinic could re-coup the deductible that it had waived. He encouraged the agent to come back for additional adjustments as soon as possible so that he could begin receiving massages – or as he put it "knock them out now, get on to the good stuff."  Indeed, he described the insurance program as "a big shell and ball game."  (A complete version of the transcript is attached hereto at Tab F.)

During its investigation, the government approached Dr. Radin and asked him to plead guilty and cooperate against defendant Sokol.  When he heard the tape of his statements to the undercover agent, he agreed to do so.  The government allowed Dr. Radin to plead to misprision of a felony – allegedly regarding his involvement in the shredding of fee sheets.  The United States further agreed to limit the "loss amount" to $500,000.  As a result of the government's machinations, Dr. Radin faced a guideline range of 8 to 14 months and received a sentence of 6 months home confinement.  The government will likely respond that

the sentence was reasonable under the plea agreement and in light of Dr. Radin's cooperation.  But, all of this was controlled by the United States.[2]

Dr. Sokol does not contend that he should receive a similar sentence and does not argue for home confinement.  But, Dr. Sokol asks that the Court consider Dr. Radin's relative culpability and the corresponding sentence in deciding the appropriate sentence to impose on him.  Defendant Sokol contends that, since Dr. Radin was a 33% owner of the clinic that accounted for 58% of the total revenue, Dr. Radin was a participant in 19% of the total conspiracy.  (Thirty-three percent of fifty-eight percent is nineteen percent.)  Assuming defendant Sokol represents the other 81%, his relative culpability is four times greater than Dr. Radin's culpability – justifying a sentence four times greater, or 24 months.  Even assuming that defendant Sokol is responsible for 100% of the harm, the benchmark set by Dr. Radin's sentence would warrant a sentence that is five times greater – or 30 months.   Even if the Court rejects this recommendation, a sentence that is in excess of ten times Dr. Radin's sentence (as defendant Sokol anticipates the government will seek) or 20 times Dr. Radin's sentence (as the PSR currently recommends) would be unnecessarily disparate.

---

[2] Dr. Radin did not receive a reduced sentence under section 5K1.1 of the Sentencing Guidelines as he was sentenced before his cooperation was complete.

### 3.     History and Characteristics of the Defendant.

"But surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very life hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider as a necessary sentencing factor, the history and characteristics of the defendant." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (Rakoff, J.) (former CEO of General Re Corp. sentenced to custodial term of only two years, even though he was convicted of causing investor losses in excess of $500 million, based largely on his personal character which included a history of good works, numerous character references and his impending ordination as a minister).

Defendant Sokol is a first time offender.  He is a good husband, son, brother and friend.  He cared deeply for his patients and deeply regrets what he did in this matter.  His misconduct in this instance stands in sharp contrast to a lifetime of integrity, hard work, and honesty.  Numerous family members and friends have written letters to the Court attesting to defendant Sokol's character and integrity.  Those letters are attached hereto at Tab A.  Counsel will not attempt to summarize

each letter, but a few limited excerpts demonstrate defendant Sokol's hard work, kindness, and compassion. Since his mother passed away several years ago, he has been the primary support for his father. His sister, Wendy Sokol, wrote that "when our mother sadly passed away, Andy was the rock of our family. … To this day, he still takes care of our father. He is our father's primary emotional rock and source of strength." His mother-in-law, for example, writes:

> I believe Andrew to be compassionate, supportive, loyal, duty-bound, responsible, and always considered him to be a person of integrity. … Andrew has had a wide range of interactions with an extensive group of family members spanning four generations. In all that time and with all that experience, a serious criticism, concern, or red flag of any consequence has not been raised against him.

Similarly, his sister-in-law Amy Head writes as follows:

> I have had the opportunity on many occasions to witness Andy's love and care for his own family. He has spent a great deal of time caring for his own parents. Living quite a distance away from his parents has not stopped Andy from tending to anything that they needed whether it be financial support in times of his parents' health issues or emotional support during his mother's illness and death. Andy has been and continues to be a faithful son.

Sheldon Baker, a family friend, for example, writes:

> From observing Andy's interactions with people and his community he has always been compassionate, caring, loving with the willingness to lend a helping hand whenever needed with no questions asked. Andy has portrayed these wonderful character traits by being very active in the community! He donates his time and money to multiple charities like Make a Wish Foundation, American Cancer Society, Green Peace, Pick

of the Litter and Sea Sheppard Conservatory.  Andy's contribution to the community has been meaningful and very impactful.

Another friend, Alan Schafer, writes:

> I have always been extremely impressed by Andy's strong philanthropic and caring nature as he has spent a great deal of time helping out with various animal organizations that specialize in pet rescue and adoption. Andy is also someone who never hesitates to help a friend often putting other's needs before his own.  His kindness, warmth and willingness to help others make him an extraordinary friend and positive influence in several communities.

Finally, his brother-in-law, Brian Rogers, says this about him:

> Andy's character goes beyond just a loyal and solid friend and family member.  He is also a socially conscious person who has been deeply engaged in many causes through-out the twelve years that I have known him.  His activities have ranged from donations and fund raising to volunteering time and wrangling friends and family members to help with the cause.  He is most passionate in helping out where animals or people who've had a hard time in life are concerned.

### 4.    General Sentencing Goals.

Finally, pursuant to 18 U.S.C. § 3553(a)(2), the Court is to consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence and to protect the public from further crimes of the defendant. Defendant Sokol submits that a lengthy sentence of incarceration is not necessary to accomplish these goals; rather, a sufficient sentence here is one that provides for some shorter period of incarceration and restitution to the victims.

A lengthy sentence of incarceration for defendant Sokol is not necessary to promote respect for the law.  The United States has already resolved Dr. Radin's culpability and, in doing so, has a set a benchmark for the level of incarceration needed to promote respect for the law.  Giving defendant Sokol a sentence that bears some relationship to the sentence that Dr. Radin received as a result of the United States's decisions could not possibly evoke criticism.  Indeed, allowing a huge disparity between these two people may promote disrespect or seem unfair and unjust.

Nor is a lengthy sentence of incarceration necessary for defendant Sokol to be justly punished for his offense.  Rather, as one district court recently noted, entry of a substantial criminal fine and restitution is often an equally if not more significant form of retribution than prison time in financial offenses.  *Adelson*, 441 F. Supp. 2d at 514.  All that a prison sentence will ensure is that defendant Sokol is unable to support his father and is unable to make restitution.

A lengthy sentence of incarceration is not necessary to provide general or specific deterrence – surely a lesser sentence of incarceration can do that.  *See United States v. Yeaman*, 248 F.3d 223, 238 (3rd Cir. 2001) (Nygaard, J. dissenting) ("It is widely recognized that the duration of incarceration provides little or no general deterrence for white collar crimes.").  Nor does defendant Sokol need

"extra" punishment to deter him from re-offending.  Indeed, to send him to prison for a long period of time, nearly 4 years after his offense, and after he has accepted full responsibility makes no sense, and would send him exactly the wrong message.

Another important goal of sentencing is to protect the public from future crimes by the defendant – to, in effect, incapacitate him.  However, here, a lengthy term of imprisonment, as the Probation Office recommends, is not necessary to achieve that goal.  There is no reasonable likelihood that defendant Sokol will re-offend.  Before this offense, he had no history of illegal behavior and, in the four years since the illegal activity ended, he has not had any other problems.  He has lost his license to practice and may never get it back.  He is aware of the great pain he has already caused himself and his family and will have no future inclination to break the law.  Incarceration to the degree recommended by the probation officer is not necessary to accomplish this goal.

## IV.   CONCLUSION

Andrew Sokol's illegal conduct in this case stands in stark contrast to an otherwise exemplary life and is atypical of his character.  He has accepted complete responsibility for his actions and asks this Court to impose a sentence that bears some reasonable relationship to the sentence received by his primary co-

conspirator.  Defendant Sokol, therefore, respectfully asks that the Court sentence him to a term of imprisonment of 24 to 30 months.

Respectfully submitted this 20th day of June, 2011.

/s/ Michael L. Brown
Michael L. Brown
Georgia Bar No. 088875
Ryan J. Lewis
Georgia Bar No. 692391
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone: (404) 881-7000
Facsimile:  (404) 881-7777
ryan.lewis@alston.com

*Attorneys for Defendant Andrew Sokol*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1C</u>

This is to certify that the foregoing document was formatted in accordance

with Local Rule 5.1C in Times New Roman font, 14-point type.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a copy of the foregoing Defendant

Andrew Sokol's Sentencing Memorandum upon counsel using the CM/ECF system,

which will automatically send e-mail notification of such filing to counsel of record.

This the 20th day of June, 2011.


/s/ Ryan J. Lewis
Michael L. Brown
Georgia Bar No. 088875
Ryan J. Lewis
Georgia Bar No. 692391
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
ryan.lewis@alston.com

*Attorneys for Defendant Andrew Sokol*